Smith, P. J.
The indictment contains two counts. The full count charges the defendant with stealing one watch of the value of eighty-five dollars, one chain of the value of forty dollars, two rings of the value of twenty-five dollars each, twelve spoons of the value of one dollar each, and three hundred and fifty dollars in money of the value of $350, the property of Douglass Ouley. The second count charges him with receiving like property of like value theretofore stolen from said Douglass Ouley, by some person unknown, the defendant knowing it to have been stolen. The conviction was under the first count only.
It appeared at the trial that Douglass Ouley was a resident of Westfield, Chatauqua county; that he died on the 6th of July, 1884; that he was sick about five months and confined to his house for that period before he died; that the defendant, who was his brother, came to his house about four weeks before his death and remained there till he died; and that while defendant was there, Douglass received $1,030 pension money, a part of which he caused to be deposited in the Erie County Saving Bank. The herein amount deposited was not shown by the prosecution, but *796 the defendant testified in his own behalf that nis brother requested him to take the pension money and deposit it in the bank, and get some money; that he deposited $700 of the money in his brother’s name, and brought the balance home, ana gave him $200 of it, and he told defendant to keep the balance. It further appears that subsequently Douglass signed some blank checks and gave them to defendant, with directions to get money out of the bank, and that the defendant caused said checks to be filled up, and drew out the balance of the money, $350 of which he retained for his own use. He claimed to have been authorized by his brother to retain it, and upon that point the following testimony; was given:
On the part of the prosecution, Mrs. Ouley, the widow of Douglass, testified that about the seventeenth or eighteenth of June her husband drew four blank checks and gave them to James, in her presence; that he then had $450 in the bank; that witness asked her husband if he was going to have the whole amount drawn from the bank, and he said “No, he was going to have him draw a hundred dollars, the balance was to remain there till after his death for I (witness) would need it; he would sign the checks for fear he would get so weak he could not write. ” She also testified that she afterwards saw three of the checks in defendant’s overcoat pocket. Upon this testimony, the prosecution claims that the defendant by filling up the blank check for $450 instead of $100 as intended and directed by Douglass, drew the entire balance, and appropriated $350 dollars thereof to his own use, with intent to deprive or defraud his brother of the same.
The defendant testified that he resided in Illinois, and was telegraphed to come to his brother; that he had previously had dealings with his brother, and the latter was indebted to him in several hundred dollars in respect to certain transactions, which he detailed on the stand; that there was no occasion when his brother gave him four blank checks and told him to draw $100 and leave the balance there for his wife; nothing of the kind; that after the balance in the bank was reduced to $700, his brother gave him, at one time, a check for $100, which he got and gave to his brother; that on the 15th of June his brother gave him a check for $150, on which he drew the money, and that on the 20th June his brother gave him another blank check and told him to draw the balance of the money in the bank; that he did so and brought the money home, and his brother gave it to him, and said, “You can have that on what I owe you.” Two checks were put in evidence by the prosecution, one dated 15th of June, for $150, the other dated 20th of June, for $450. This is, in *797 substance, the testimony bearing directly upon the question as to the manner in which the defendant obtained possession of the §350 alleged to have been stolen.
As to the watch, chain and rings, Douglass had those articles in pawn with one Madison; he informed the defendant of the fact, and told him to go and redeem them, and directed his wife to give defendant the pawn tickets, which she did; defendant redeemed the articles and kept them in his own possession. Mrs. Ouley testified that her husband’s direction to defendant was, to take some of the.pension money and redeem the articles. She also testified: “I don’t intend to say that my husband said to go and redeem the watch and rings and bring them there; I suppose he intended he would bring them back.” The defendant testified that he used his own money to redeem the property; that he took the articles home and showed them to his brother for identification, and his brother said to witness, “You nan have them; I don’t think I shall ever wear it again;” and witness thereupon took them, and has kept them ever since. A witness, John Garaher, testified that in a conversation with Douglass respecting the watch, in the spring of 1884 Douglass said it was going to his brother James if he outlived Douglass. The wife of the last witness testified that in the winter or fall before his death Douglass came to witness’ house and said that he had made a will, and said he had given to his brother James his watch and other articles which he named. Mrs. ■Ouley also testified, on cross-examination, that the day, or the day after, the watch was redeemed she asked defendant if he had the watch, chain and rings, and he said he had, and on her asking him if he would let her have them, he said perhaps she would see them and perhaps she would not, and that she did not tell her husband of this conversation.
In regard to the spoons, there was no positive proof, on the part of the prosecution, that the defendant took them, but the defendant admitted, on the stand, that he had them and he testified that they originally belonged to his mother and on her death they were left with his father, who gave them to Douglass, telling him he could have them as long as he lived, and when he died he would give them to defendant; that two or three weeks before his death he sent defendant for a drawer or till to his trunk, which defendant brought to him, and that Douglass took the spoons out and handed them to defendant, telling him they were their mother’s spoons and that he was to take care of them.
Mrs. Ouley testified that her husband, prior to his sickness, had kept' his business relations almost entirely from *798 her, and, as she expressed it, did his business in rather an underhanded way.
There are some collateral circumstances shown by the testimony, upon which counsel have commented in their briefs, to which it is not necessary to advert at present; the foregoing statement presents substantially, all the material testimony bearing upon the question, whether the offense alleged in the first count of the indictment was proved. By section 528 of the Penal Code a person who, with intent to deprive or defraud the true owner of his property * * secretes, withholds or appropriates to his own use * * any money or personal property * * or having in his possession, custody or • control, as a bailee, servant or agent * * any money or property * * appropriates the same to his own use, is guilty of larceny.
Section 548 provides that, upon an indictment for larceny, it is a sufficient defense that the property was appropriated openly and avowedly, under a claim of title preferred in good faith, even though such claim is untenable.
It was, of course, incumbent on the prosecution to make a case which precluded beyond reasonable doubt the hypothesis of the defendant’s innocence. The question whether the defendant had a bona fide claim to the property appropriated by him, depended almost entirely upon transactions between himself and his brother, in respect to-which the prosecution was unable to make direct proof, in consequence of the death of the brother, with the exception of the interview between them in respect to the blank checks, at which Mrs. Ouley was present. With regard to-that interview, the jury had the right to decide that Mrs. Ouley’s version was correct, if they believed her testimony, and consequently to conclude that in respect to the $350 of money, the defendant was guilty, unless they believed his statement of what occurred between his brother and himself concerning the money when he returned with it-from the bank.
But in regard to the other property, what evidence is. there that the defendant came by it, or retained it wrongfully and feloniously? He was told to redeem the watch, chain and rings, and he did so. His retention of the property is not shown to have been unauthorized. The suggestion of Mrs. Ouley that he was directed to bring them to the house is plainly a mere inference of hers; there is no-proof that a direction to that effect was given. He did not conceal the fact that he retained them; when asked the-same day, or the next, by Mrs. Ouley if he had done so, he admitted it; and he, in effect, denied her right to them. The fact that she omitted to inform her husband of his *799 possession of, and claim to, the property, is some evidence that she did not then think that the defendant was violating the instructions given him by her husband.
As to the spoons, there is no proof whatever on the part of the prosecution of the circumstances under which the defendant got them, whether with or without, the consent of his brother.
So that, if the testimony of the defendant be entirely disregarded, there is no evidence that the defendant took or withheld the property, other than the money, with a criminal intent, or even without the consent of the owner. But the court distinctly submitted it to the jury to find whether the defendant was guilty in respect to that property, i. e., the watch, etc., rings and spoons; and for aught that appears in the appeal book, the verdict may have been rendered on that ground alone, those articles having been proved, without contradiction, to exceed twenty-five dollars in value.
Now, considering the friendly relations that existed between these brothers, as disclosed by the evidence on the part of the prosecution, the extent to which Douglass availed himself of the services of his brother during his illness; the admitted reticence of the deceased in regard to communicating his business affairs to his wife, the principal witness for the people; the frankness of the defendant towards her in respect to his possession of and claim to the property that he had redeemed, and the other circumstances of the case, it would be a dangerous precedent to hold that this conviction can be sustained in, the absence of evidence as to whether or not the defendant obtained or withheld the possession of such property without the consent of his brother. Ordinarily, the bare possession of stolen property may be sufficient to call on the possessor to explain how he came by it; but there must first be proof that the property was taken feloniously from the owner, and of proof of that nature the present case is barren.
Upon this branch of the case, we think injustice has been done to the defendant, for which there should be a new trial.
Mrs. Ouley, on her direct examination, was asked the following question: “When this money was drawn out of the bank, and when the watch and chain and rings were taken away, and the spoons were taken, was that practically all the personal property there was left in the city of Buffalo belonging to your husband?” The question was objected to, the objection was overruled, and exception was taken, and the witness answered: “Yes, sir; I think it was everything.” It is difficult to conceive of any legitimate bearing the question had upon the issue, and it is obvious that the *800 answer, by suggesting that the widow had been made destitute by the practices of the defendant, may have excited the sympathies of the jurors to the defendant’s prejudice. The limiting of the inquiry to property in the city did not, as the respondent’s counsel contends, make the question unobjectionable, there being no evidence that the deceased had personal property elsewhere at the time of his death. We think the ruling was erroneous.
Witnesses were called by the prosecution to impeach the general character of the defendant for truth and veracity. F. M. Wright testified that he was a deputy sheriff at West-field; that he knew defendant in his boyhood; had seen him more or less for the last two years at Westfield; perhaps half-a-dozen times; never had dealings with him; and arrested him a few days before the trial. The witness then stated in substance that he had had conversation about the defendant with persons who knew him; associated with him and had business with him at Westfield. He was then asked, “Do you know what his reputation is among the people he has resided with while you have known him ? ” His answer was, “Yes, sir: among those whom I have had occasion to speak with.” Defendant’s counsel objected on the ground that the witness has not shown himself competent to testify as to the reputation of the witness. The objection was overruled and an exception taken. And the witness then said from what he had known of the defendant’s reputation, as he had stated, he could not believe him under oath.
As we understand the testimony of Mr. Wright, he was not shown to have had any acquaintance with the speech of people generally concerning the defendant’s character for truth at Westfield or elsewhere. He did not profess to have such acquaintance. His answers may have been true, even if he had heard only two persons speak of the defendant in his life. The objection that he was not shown to be competent was well taken and should have been sustained. Greenlf. Ev., vol. 1, § 461, and cases there cited.
The judgment and conviction should be reversed and a new trial ordered, and the proceedings remitted to the court of sessions of Erie county. The order to state that the reversal is upon the facts as well as the questions of law presented by the exceptions considered in the opinion.
Haight and Bradley, J J., concur; Barker, J., not voting.
So ordered.